## HARBOR TOWING CORPORATION v. PARKER et al.

## SWIFT & CO. v. PARKER et al.
### THE RUTH CONWAY.
### THE HUSTLER.
### THE NO. 110.

Nos. 5789, 5790.

United States Court of Appeals· Fourth Circuit.

Dec. 13, 1948.

John H. Skeen, Jr., and John H. Skeen, both of Baltimore, Md. (Frank, Skeen & Oppenheimer, of Baltimore, Md., on the brief), for Harbor Towing Corporation.

George W. P. Whip, of Baltimore, Md. (Lord & Whip, of Baltimore, Md., on the brief), for Luke R. Parker.

Theodore Rognald Dankmeyer, of Baltimore, Md. (Niles, Barton, Morrow & Yost, of Baltimore, Md., and Macklin, Brown,

Lenahan & Speer, of New York City, on the brief), for Swift & Co.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

Luke Parker, owner of the motor vessel Ruth Conway, in the United States District Court for the District of Maryland, filed a libel in admiralty against the tug Hustler, Barge No. 110 and Harbor Towing Corporation, owner of the tug and barge. The libel sought damages for the loss of the Conway, in the Chesapeake and Delaware Canal, resulting from a collision between the Conway and Barge No. 110, which was being towed by the tug Hustler.

Swift & Company, owner of the cargo of fertilizer on the Conway, filed its libel against Luke Parker, Harbor Towing Corporation, the tug Hustler and Barge No. 110, for the loss of this cargo of fertilizer caused by the collision.

Harbor Towing Corporation, as owner of the tug Hustler, filed a petition for exoneration from, or limitation of, liability.

These cases were consolidated for trial by the District Court which dismissed the libels of Parker and Swift as to Barge No. 110 but sustained the libels as to the tug Hustler and Harbor Towing Corporation. The District Court denied Harbor Towing Corporation's petition for limitation of, or exoneration from, liability. A final decree was duly entered. Harbor Towing Corporation has appealed from this decree; and Swift has appealed from that portion of the decree which denied a recovery to Swift against Parker, as owner of the Conway, and against Barge No. 110.

The collision between the Conway and Barge No. 110 occurred about Midnight on October 30, 1946, in the Chesapeake and Delaware Canal, approximately one mile east of the Pennsylvania Railroad bridge near Chesapeake City, Maryland.

The Conway was about 107 feet long, 25 feet beam and had a draft of 6 feet. The tug Hustler was about 66 feet long, 16 feet beam and had an extreme draft of 8 feet. Barge No. 110 had a length of 99 feet, beam of 24½ feet and a draft of 7 feet.

The tug Hustler, with Barge No. 110 made fast on the tug's starboard side, was proceeding west; the Conway was going east. The bow of the barge projected forward beyond the bow of the tug. The night was dark, with normal visibility, and there was no appreciable wind. Since the Conway was proceeding with the current, it had the right of way over the Hustler proceeding against the current. Secretary of War's Regulations, No. 11. The so-called Narrow Channel Rule, Article 25 of the Inland Rules, 33 U.S.C.A. § 210, required these vessels, when it was safe and practicable, to keep to their own right-hand (starboard) sides. The Mamei, 3 Cir., 152 F.2d 924, certiorari denied Eastern Transport Co. v. Walling, 328 U.S. 836, 66 S.Ct. 981, 90 L.Ed 1611. There was testimony of a rather heavy tide, about 6 miles an hour, aggravated by the curves in the Canal to the east and west of the scene of the collision. At the point of collision, the navigable width of the Canal was a little less than 100 yards.

There was quite a conflict in the evidence as to just what happened immediately prior to the collision. Under these circumstances, the District Judge must determine the credibility of the witnesses and we can set aside the findings of fact made by the District Judge only when these findings are clearly erroneous. See, decided by our Court, the recent case of The Scow No. 27, 164 F.2d 778.

The Mate of the tug Hustler (who was at the wheel with Captain Smith, in the pilot house) testified that the Conway was first observed more than half a mile away, with only her green (starboard) light visible; that the Mate then gave a two-blast signal for a green, starboard to starboard, passing; that the Conway (when "a couple thousand feet" away) replied with a one-blast signal for a red, port to port, passing; that the tug sounded no other signal and held her course until the Mate saw the Conway's red light when the Conway was about 150 feet distant, whereupon the tug sounded three blasts and went astern with a hard right wheel. Captain Smith, of the tug Hustler, testified as to the two-blast signal given by the tug but he stated that

418

the Conway blew no reply signal. Though the three-blast reverse signal was given, no four-blast danger signal was ever sounded by the Hustler.

Evidence was given, on behalf of the Conway, that her one-blast signal for a port to port crossing was assented to, but not followed, by the Hustler, and that the Conway was to the south of the center of the Canal, as required by the Narrow Channel Rule. The position of the Conway, after she sank as the result of a great hole driven in her port bow, tends to confirm this. It was probably because the Conway was just completing a turn to her starboard and consequently showed only her green light to those on the Hustler that the Captain of the Hustler thought the Conway was to the north of the center of the Canal and that a starboard to starboard passing was therefore possible. At that time, the tug was to the south of the Conway at another curve in the Canal, hence the Conway, though she was on her starboard side of the Canal, could show only her green light to the tug.

The engineer of the Conway testified that, after the collision, Captain Smith of the Hustler stated that he (Captain Smith) might lose his job on account of the collision and that he would never again take the barge through the Canal under like circumstances. Captain Smith, though a man of long experience on ships, had no license whatever, and, in his own testimony, showed a lack of familiarity with the rules of navigation on inland waters. There was also testimony that the Hustler had difficulty in breasting the current.

█ We must accordingly uphold the findings of the District Court that the Hustler violated the Narrow Channel Rule, failed to blow a danger signal, attempted improperly a starboard to starboard passing and the District Court's conclusions of law that these faults of the Hustler caused the collision and that there was no contributing fault on the part of the Conway. Instructive cases, here, are The San Simeon, 2 Cir., 63 F.2d 798, 799, certiorari denied Pacific Atlantic S. S. Co. v. Mooremack Gulf Lines, 290 U.S. 643, 54 S.Ct. 61, 78 L. Ed. 558; The Sabine Sun, 33 F.2d 42;

Yamashita Kisen Kabushiki Kaisha v. McCormick, 9 Cir., 20 F.2d 25, certiorari denied 275 U.S. 562, 48 S.Ct. 120, 72 L.Ed. 427; The Bilbster, 2 Cir., 6 F.2d 954; The Gerry, D.C., 161 F. 413.

█ In connection with the appeal of Swift & Company from that portion of the decree denying a recovery against Barge No. 110, we note that the only significant act of negligence charged against the Barge was the alleged absence of proper lights. The District Judge, in his opinion, stated: "There is some evidence that the barge was not properly lighted; but we believe this evidence to be inconclusive." 75 F. Supp. 514, 516. We cannot disturb this finding that the barge was free from fault.

We come next to the District Court's dismissal of Harbor Towing Corporation's petition for the limitation of liability to the value of the tug Hustler. This decision was based on two grounds: (1) The incompetency of Captain Smith of the Hustler, with an imputation of knowledge of such incompetency to Harbor Towing Corporation; and (2) The tug Hustler's lack of sufficient power to properly handle the barge on the trip through the Canal. Again we must sustain the District Court.

█ The incompetency of Captain Smith is clearly demonstrated and, on the record before us, there was ample ground for imputing knowledge of this incompetency to Harbor Towing Corporation. The Calvert, D.C., 37 F.2d 355, 364, modified 4 Cir., 51 F.2d 494; Eastern S. S. Corporation v. Great Lakes Dredge & Dock Co., 1 Cir., 256 F. 497, 504; McGill v. Michigan S. S. Co., 9 Cir., 144 F. 788, 795, certiorari denied 203 U.S. 593, 27 S.Ct. 782, 51 L.Ed. 332.

█ Strong credence of the lack of power on the part of the tug Hustler to handle properly the barge on the trip through the Canal is lent by the whole picture of the facts surrounding this collision. Captain Cullison, a seafaring man with wide experience in towage through this Canal, testified that a tug of not less than 400 horsepower was required to handle this barge safely. The Hustler was a tug of not over 210 horsepower. There was evidence that

after the collision, while the tug and barge were proceeding to Chesapeake City, the barge sheared and went aground. We advert again to the statement made by Captain Smith after the collision, heard by the engineer of the Conway. Then (though the District Judge was not impressed by Doty's evidence "for obvious reasons of probable bias or animosity") Doty, bargeman on Barge No. 110, testified that before the voyage began he (Doty) told Mr. Rogers, of Harbor Towing Corporation, that he (Doty) was unwilling to make this trip through the Canal as the Hustler had insufficient power to handle the barge. Doty testified further that, on the night of October 30, he asked Captain Smith to tie up and not attempt to go through the Canal because he (Doty) knew that the Hustler could not handle the barge while bucking the tide. As to the insufficiency of a tug in towage operations, see particularly The Severance (decided by our Court), 152 F.2d 916, 922, certiorari denied Stone v. Diamond S. S. Transp. Corp., 328 U.S. 853, 66 S.Ct. 1344, 90 L.Ed. 1626.

The decree of the District Court is affirmed.

Affirmed.